**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JOHNNY FUSELIER,** *individually*                          **PLAINTIFF**
*and on behalf of a class of all others*
*similarly situated*


**v.**                                           **Civil No. 1:25-cv-268-HSO-BWR**


**JOHN S. RISCASSI,** *in his official*
*capacity as the Chief Operating*
*Officer of the Armed Forces*
*Retirement Home*                                   **DEFENDANT**

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT JOHN S. RISCASSI'S MOTION [18] FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF JOHNNY FUSELIER'S MOTION [3] FOR A PRELIMINARY INJUNCTION

Plaintiff Johnny Fuselier, a Vietnam War veteran and resident of the Armed Forces Retirement Home—Gulfport, brought this action against Defendant John S. RisCassi, in his official capacity as the Chief Operating Officer of the Armed Forces Retirement Home.  Fuselier alleges that the Government violated his First Amendment rights when it enforced a provision in the Armed Forces Retirement Home—Gulfport, Resident Guide restricting political apparel in the Home's common areas.  Defendant now seeks summary judgment under Federal Rule of Civil Procedure 56.  Defendant's Motion [18] should be granted because the Government's restriction on political speech is reasonable in light of the nature and purpose of the forum.

## I.  BACKGROUND

Plaintiff Johnny Fuselier ("Plaintiff" or "Fuselier") is a Vietnam War veteran

and long-term resident of the Armed Forces Retirement Home—Gulfport, a gated,

guarded, all-inclusive residential retirement home located on the shores of the Gulf

of America ("AFRH-G," "Defendant," or "Government").  *See* Compl. [1].  Created by

Congress, the AFRH-G, along with the Armed Forces Retirement Home—

Washington, D.C., was incorporated into an "independent establishment in the

executive branch:" the Armed Forces Retirement Home ("AFRH").  24 U.S.C. §

411(a).  The AFRH's purpose is to provide "residences and related services for

certain retired and former members of the Armed Forces."  24 U.S.C. § 411(b).  It is

led by the Chief Operating Officer of the Armed Forces Retirement Home who is

"subject to the authority, direction, and control, of the Secretary of Defense."[1]  *See*

24 U.S.C. §§ 411(d)(1).

Although the AFRH is a unique federal entity, the "administration of the

Retirement Home" is "under the control and administration of the Secretary of

Defense," 24 U.S.C. § 411(d)(3), and the Department of Defense provides

> administrative support and office services, legal and policy planning
> assistance, access to investigative facilities of the Inspector General of
> the Department of Defense and of the military departments, and any
> other support necessary to enable the Retirement Home to carry out its
> functions under this chapter,

---

[1] Executive Order 14,347 authorizes the Department of Defense and the Office of the Secretary of Defense to be referred to as the Department of War.  *See* Exec. Order No. 14,347, Restoring the United States Department of War, 90 Fed. Reg. 43,893 (Sept. 5, 2025).  But by statute, the name is "The Department of Defense."  *See* 5 U.S.C. § 101.  The Court uses the Department name employed by both parties.

24 U.S.C. § 411(f).

To support the AFRH's purpose of providing "residences and related services" to veterans, 24 U.S.C. § 411(b), it provides "for the overall health care needs of residents in a high quality and cost-effective manner, including on site primary care, medical care, and a continuum of long-term care services," 24 U.S.C. § 413(b). Consistent with Congress's mandate, the AFRH-G offers five housing options, ranging from "Independent" to "Long-Term Care/Memory Care," AFRH-G Resident Guide at 57,[2] provides on-site medical services, including a pharmacy, and offers scheduled transportation to nearby medical centers, *id.* at 46.  The Home also affords various amenities to residents, such as an onsite "Navy Exchange," *id.* at 58, a hair salon, *id.*, and onsite recreational facilities, including a "Bocce Center," "Bowling Center," and "Club Room," *id.* at 62.  This creates a unique environment in which there are both private living areas and shared common areas.

As a "Federal Facility," the AFRH-G is operated by federal employees, including active-duty military personnel. *Id.* at 27 (citing 18 U.S.C. § 930(g)); Resp. [13] in Opp'n to Prelim. Inj. [13] at 5-6; Reply [17] at 3 (acknowledging that active-duty servicemembers work on campus).  Guest access to the campus is restricted to a single gate that is manned by security personnel at all times.  Resident Guide at 26.  Guests must be sponsored by a resident or "Federal/contract staff member,"

---

[2] Hereinafter cited as "Resident Guide."  The parties cite different versions of the Resident Guide. The Government attaches and cites the 2023 version.  Plaintiff cites but does not attach a copy of the 2024 version.  The Court will refer to and quote the 2024 version, available at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.afrh.gov/sites/default/files/Gulfport-Resident-Guide-2024-Final.pdf (last visited April 30, 2026).

must obtain a visitor's badge, and must display the badge "at all times during their stay." *Id.* All persons entering AFRH-G property "are subject to search of their private property." *Id.* at 14.

The AFRH-G also prescribes certain rules for its residents, such as requiring them to complete a "leave form" if they intend to leave campus for more than twenty-four hours, *id.* at 12, and it prohibits drinking alcohol (except in designated areas) and possessing a firearm on campus, *see id.* at 27-28 (citing 18 U.S.C. §§ 930(a), (g)). It also prohibits conduct and dress—in common areas—that it deems "inappropriate." *Id.* at 14-16. One class of apparel deemed "inappropriate" is "political" apparel:

> **a. <u>Conduct</u>**: Residents are expected to conduct themselves in a manner that will promote harmony, safety, security and consideration of others. Negative behavior, such as using racial slurs, engaging in confrontations, swearing, and damaging the property of other Residents will not be tolerated . . . Signs and apparel of racial, sexual, political, or ethnic slogans are not permitted . . . .
> . . .
> **b. <u>Dress</u>**: In public spaces, Residents are expected to wear clothing that is clean, neat, serviceable, and conducive to adult living. Apparel with racial, sexual, political, or ethnic slogans is considered inappropriate dress at the AFRH-G . . . .

*Id.* at 15, 16; Mem. [4] at 2.

As a "passionate supporter of President [Donald] Trump and other Republican political candidates and officials," Mem. [4] at 2, Fuselier wants to show his support by donning apparel and displaying signs with political slogans in campus common areas, *id.* For example, he wishes to wear apparel with the slogans "Trump 2024 Save America Again!" and "Let's Go Brandon," Compl. [1] at 4, and adorn his orthopedic walker with slogans like "Vote Republican Vote MAGA"

4

and "Tate Reeves for Governor," *id.* But he asserts that the AFRH's political apparel ban prevents him from doing so.

Plaintiff claims that in June and July 2023, the AFRH-G circulated its weekly bulletin containing the following reminder:

> POLITICAL CLOTHING/SIGNS: Per guidance from AFRH Legal & IG and the Resident Guide, clothing or signs in support or against a CURRENT political candidate is inappropriate and not allowed at AFRH-G.

*Id.* After seeing that announcement, Fuselier "demanded that AFRH permit him to wear and display political slogans," but it denied his request. *Id.* at 5. In late June 2023, Fuselier "affixed two printed signs to his orthopedic walker while in the common areas" of the retirement home. *Id.* One sign stated "2024 – Make Us Great Again" and the other stated "Let's Go To Brandon MS." *Id.* According to Plaintiff, the Resident Officer "ordered him to remove the signs" and informed him that refusing to comply could result in an "administrative hearing," and possible eviction.[3] *Id.* Fearful, Fuselier complied. *Id.*

In July and August 2024, officials again circulated weekly bulletins reminding residents of the political speech regulations, and in August 2025, officials held a "townhall" and "reiterated that residents are prohibited from wearing political apparel at any time in the areas of campus that are generally accessible to residents." *Id.* at 7. Following the townhall, Plaintiff again "demanded" that he be

---

[3] According to the Resident Guide, "[h]earings normally result from an alleged individual act, such as abusive language directed towards others, alcohol-related incidents," and the like. Resident Guide at 22. "The administrative actions for these infractions may range from a reprimand, suspension of facility privileges, an apology to the offended party, counseling, or dismissal from AFRH-G." *Id.*

allowed to wear and display political slogans in common areas, but the AFRH-G

denied this request.  *Id.* at 8.

Plaintiff filed suit in August 2025, seeking a preliminary injunction enjoining

the enforcement of the "political slogan ban," *id.* at 12, and a declaration that the

prohibition on political speech violates the First Amendment, *id.*  While his Motion

[3] for a Preliminary Injunction was pending, Defendant moved for summary

judgment.  *See* Mot. [18].[4]

## II.  DISCUSSION

A.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine 'if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party,' and a

material fact issue is one that 'might affect the outcome of the suit under the

governing law.'"  *Yates v. Spring Indep. Sch. Dist.*, 115 F.4th 414, 419 (5th Cir.

2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Where

the burden of production at trial ultimately rests on the nonmovant, the movant

must merely demonstrate an absence of evidentiary support in the record for the

---

[4] For the reasons stated herein, the Court finds that Plaintiff's Motion [3] for a Preliminary Injunction should be denied because he has not carried his burden of showing a substantial likelihood of success on the merits.  *See Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (stating the four factors for injunctive relief).  His Motion [3] should also be denied because Plaintiff's inequitable conduct bars equitable relief.  *See Ramirez v. Collier*, 595 U.S. 411, 434 (2022) (explaining that inequitable conduct can bar equitable relief).  Fuselier waited more than two years after the AFRH-G first denied his request to wear political apparel, and a year after the second denial, to sue, and he offers no explanation for the delay or evidence of any attempts to vindicate his rights during that period.

nonmovant's case." *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 310-11 (5th Cir. 2017) (quotation marks and citation omitted). "The nonmovant must then come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). "The nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Murrell v. Casterline*, 307 F. App'x 778, 779 (5th Cir. 2008) (per curiam).

B.     Defendant's Motion [20] for Summary Judgment

1.     Defendant's Motion is not Premature

Initially, Plaintiff opposes Defendant's Motion [18] on grounds that summary judgment is premature. *See* Resp. [20] at 1. According to Fuselier, strict scrutiny should apply to the Government's speech restrictions and Defendant cannot satisfy that standard without a "robust evidentiary record." *Id.* at 2. Plaintiff asserts that "Rule 56(a) mandates the entry of summary judgment only 'after adequate time for discovery,'" *id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)), and therefore "AFRH has remarkably moved for a final adjudication on the merits before a single document has been produced in discovery," *id.* Plaintiff reasons that this makes Defendant's Motion [18] "procedurally extraordinary" and "unprecedented." *Id.* at 3. He also argues that "rush[ing] to judgment is particularly inappropriate" because of the "class proposed in the Complaint [1]," *id.*, and, according to him, "[t]he Fifth Circuit generally favors resolving class certification—or at least allowing for the requisite class discovery—before or

7

alongside dispositive merits rulings," *id.* at 3-4 (purporting to cite *Rodriguez v. It's Just Lunch, Int'l*, 2013 WL 12173926 (5th Cir. 2013)).

There are three problems with Plaintiff's argument.  First, *Celotex* does not stand for the proposition for which Plaintiff cites it.  In *Celotex*, the Supreme Court examined Rule 56(c), not Rule 56(a), and did not hold, as Plaintiff claims, that "Rule 56(a) mandates summary judgment '*only* after adequate time for discovery.'"  *Id.* at 2 (quoting *Celotex*, 477 U.S. at 322) (emphasis added).  Rather, the Supreme Court explained that

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322.  Put another way, the district court must enter summary judgment if the non-moving party fails to establish the existence of an essential element of a claim that they have the burden of proving at trial.  *Celotex* did not mandate discovery prior to summary judgment.

Nor could it.  Rule 56(b) provides that "a party may file a motion for summary judgment *at any time* until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b) (emphasis added).  And the Fifth Circuit has held that by its plain text, "Rule 56 does not require that any discovery take place before summary judgment can be granted."  *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990); *see also Am. Nat'l Prop. & Cas. Co. v. Est. of Farese*, 530 F. Supp. 3d 655, 664 (S.D. Miss. 2021) (same); *Markel Am. Ins. Co. v. Tri-Miss Servs., Inc.*, No. 3:10-cv-702-DPJ-FKB, 2012 WL 162028, at *1 (S.D. Miss. Jan. 19, 2012) (describing this

principle as "well established").  That is exactly what the Government did here.  Contrary to Plaintiff's argument, there is nothing "unprecedented," "procedurally extraordinary," or "remarkabl[e]" about the timing of Defendant's Motion [18].  Resp. [20] at 2, 3.

Nonetheless, "to ensure that summary judgment is not granted prematurely," courts may defer ruling on a motion for summary judgment under Rule 56(d).  *Am. Nat'l Prop. & Cas. Co.*, 530 F. Supp. 3d at 664.  "Rule 56(d) allows the district court to provide additional time for discovery before ruling on a motion if the nonmovant shows an inability to support its opposition factually."  *Smith v. Regional Transit Authority*, 827 F.3d 412, 422 (5th Cir. 2016) (citing Fed. R. Civ. P. 56(d)).  But Plaintiff, as the nonmoving party, must make a threshold showing to obtain 56(d) relief and he has not even made a motion under Rule 56(d).  Nor has he claimed that he would benefit from additional time for discovery or explained how additional discovery would support his opposition to Defendant's Motion [18].  Rather, Fuselier asserts that discovery is needed for Defendant—the moving party—to prevail.  *See* Resp. [20] at 2, 3.  That is not the standard under Rule 56(d).  Because Plaintiff has not shown how he would benefit from discovery or explain how it would create a genuine issue of material fact, the Court sees no reason to defer ruling on Defendant's Motion [18].  *See Smith*, 827 F.3d at 422; *see also Sherman v. Irwin*, 849 F. App'x 451, 455 (5th Cir. 2021) (per curiam) (explaining that the nonmovant must "set forth a plausible basis for believing that specified facts . . . probably exist

and indicate how the emergent facts . . . will influence the outcome of the pending summary judgment motion").

Second, Plaintiff's claim that "[t]he Fifth Circuit generally favors resolving class certification—or at least allowing for the requisite class discovery—before or alongside dispositive merits rulings," Resp. [20] at 3-4 (purporting to cite to *Rodriguez v. It's Just Lunch, Int'l*, 2013 WL 12173926 (5th Cir. 2013)), is incorrect. On the contrary, the Fifth Circuit has held that district courts may resolve summary judgment motions prior to class certification.  *See Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir. 1987); *see also Peregoy v. Amoco Prod. Co., a Div. of Standard Oil of Indiana*, 742 F. Supp. 372, 372 (E.D. Tex. 1990) ("[A] district court can rule on motions for summary judgment before deciding on whether to certify the case as a class action."), *aff'd sub nom, Peregoy v. Amoco Prod. Co.*, 929 F.2d 196 (5th Cir. 1991); *Villagran v. Cent. Ford, Inc.*, 524 F. Supp. 2d 866, 882 (S.D. Tex. 2007) (collecting cases).

Third, and most concerning, the case Plaintiff cites to support his argument, "*Rodriguez v. It's Just Lunch, Int'l*, 2013 WL 12173926 (5th Cir. 2013)," does not exist.  This fictitious case is a combination of two real cases, and neither of those stand for the proposition Plaintiff claims.  The federal reporter number belongs to *Vasudevan Software, Incorporated v. Microstrategy, Incorporated*, No. 11-cv-06637-RS, 2013 WL 1217396 (N.D. Cal. Oct. 17, 2013), and the case caption appears to belong to *Rodriguez v. It's Just Lunch, International*, No. 07 Civ. 9227-SHS, 2013

10

WL 1749590 (S.D.N.Y. Apr. 23, 2013).  And to state the obvious: neither case is from the Fifth Circuit.[5]

Defendant's Motion [18] is not premature, and Plaintiff has not come forward with any legitimate (or frankly real) reason to postpone a ruling on the Motion [18].

2.     The Government is Entitled to Summary Judgment[6]

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  "This provision embodies 'our profound national commitment to the free exchange of ideas.'"  *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (quoting *Harte-Hanks Communications, Inc., v. Connaughton*, 491 U.S. 657, 686 (1989)) (cleaned up).  But "this principle, like other First Amendment principles, is not absolute."  *Id.*; *see also Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025).

The parties do not dispute that the speech at issue in this case—political speech—is a form of speech protected by the First Amendment.  *See Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018) ("Minnesota's ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the First Amendment.").  Nor do they dispute that "the government need not permit all forms of speech on property that it owns and controls," such that forum analysis applies here.  *Int'l Soc. for Krishna*

---

[5] Given the misrepresentations of law and fake case citation contained in Plaintiff's brief, by separate order Plaintiff's Counsel will be directed to show cause why he should not be sanctioned under Federal Rule of Civil Procedure 11.

[6] Both parties refer extensively to their respective briefs on Plaintiff's Motion [3] for a Preliminary Injunction, so the Court will refer to those arguments as well.  *See, e.g.,* Plaintiff's Resp. [20] at 5 ("As Plaintiff repeatedly demonstrated during the preliminary injunction stage . . . ." (citing Mem. [4] at 5-6; Reply [17] at 3)).

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).  Rather, the principal disagreement is whether the AFRH-G's common areas constitute designated public fora subject to "strict scrutiny," Resp. [20] at 5; *see Palo Pinto Cnty. Conservatives v. Long*, No. 24-10432, 2024 WL 3833292, at *2 (5th Cir. Aug. 15, 2024) (per curiam), or whether they constitute limited public fora subject to the less exacting reasonableness standard, *see* Mot. [19] at 2; *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) (describing the reasonableness standard).

a.      The Common Areas are Limited Public or Non-Public Fora

A designated public forum "exists where government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (citations and quotation marks omitted).  The Government "does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."  *Id.* at 215 (citation omitted).  A "limited public forum" exists "where a government has reserved a forum for certain groups or for the discussion of certain topics."  *Id.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)) (cleaned up).  "Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."  *Int'l Soc. for Krishna Consciousness, Inc.*, 505 U.S. at 678.

12

The Fifth Circuit considers two factors in determining whether a forum is a limited or a designated public forum: "(1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (cleaned up). "The Court looks to whether the government was motivated by 'an affirmative desire,' or an 'express policy,' of allowing public discourse on the property in question." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 805 (1985)).

According to Defendant, the common areas of the AFRH-G are limited public fora because the AFRH-G never intended to open them as spaces for political debate or expression. *See* Mem. [19] at 2 (citing Resp. [13] in Opp'n to Prelim. Inj. [13] at 5). Plaintiff counters that the AFRH-G has a "longstanding policy" guaranteeing the First Amendment rights of residents, Resp. [20] at 5, specifically that the following forty-six-word disclaimer opens the AFRH-G's common areas for political expression and debate:

> These provisions are not intended to interfere with Residents' First Amendment rights. The First Amendment limits the government's ability to control speech and expression. Residents of AFRH-G served this country to protect our freedom, and they retain their right to engage in vigorous expression and debate,

*id.* (quoting Resident Guide at 15). According to Fuselier, this disclaimer guarantees too much speech to "now 'claim it intended its campus to function as a limited public forum' for residents." *Id.* (quoting *Justice For All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005)).

Fuselier maintains that the disclaimer creates "a forum for those *veterans* to engage in 'expression and debate' with *each other*." Mem. [4] at 6 (emphasis in original); *see also* Resp. [20] at 5 ("[T]he common areas of the AFRH campus easily qualify as a designated forum for resident speech under this test." (citing Mem. [4] at 5-6)). But Plaintiff is describing a limited public forum, not a designated one. He claims that the Resident Guide opens common areas for a single designated class of speakers: veteran residents. And fora that are reserved for certain designated classes of speakers, like veteran residents, are textbook examples of limited public fora, not designated public ones. *See Walker*, 576 U.S. at 215 ("A 'limited public forum' . . . exists where a government has reserved a forum for certain groups or for the discussion of certain topics." (cleaned up)).

The Government's expressed intent for the common areas confirms this. The purpose of the AFRH-G is to "provide residences and related services to veterans," 24 U.S.C. § 411(b), and its "mission" is to offer "a premier retirement community with exceptional residential care and extensive support services," Resident Guide at 15. It is evident that AFRH-G's common areas and amenities, like the cafeteria, the Bocce Center, the pool, and the fitness center, are intended to support that objective, not to facilitate speech. Any expressive conduct in the common areas is ancillary to that area's intended purpose, and it is the Government's purpose, not that of the forum user, that determines the character of the forum. *See Cornelius*, 473 U.S. at 802 ("[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally

open to assembly and debate as a public forum."). And when the Government

enforces a written policy restricting expression in common areas, that is evidence

that those spaces were never intended to be fora for resident expression. *See id.* at

804-05; *Hays*, 969 F.2d at 117-118 (explaining that "the government's policy is

indicated by its consistent practice, not each exceptional regulation that departs

from the consistent practice").

Consider an example. In *Cornelius*, the Supreme Court examined a charity

drive and concluded that it was not a designated public forum because "neither [the

government's] practice nor its policy [was] consistent with an intent to designate the

[charity drive] as a public forum." 473 U.S. at 804. Instead, the Government's

"consistent policy ha[d] been to limit participation in the [charity drive] to

'appropriate' voluntary agencies and to require agencies seeking admission to obtain

permission . . . ." *Id.* The Supreme Court concluded that "[s]uch selective access,

unsupported by evidence of a *purposeful designation for public use*, does not create a

public forum." *Id.* at 805 (emphasis added). So too here. It has been neither the

practice nor the policy of the AFRH-G to permit political speech in common areas.

*See* Resident Guide at 14, 15; Compl. [1] at 6-8. The Government's policy, as

expressed in the Resident Guide, is explicitly to restrict certain types of speech in

common areas, including political speech. *See* Resident Guide at 15. And the

AFRH-G has consistently enforced that policy; indeed, it was the Government's

consistent enforcement of this policy that spawned this litigation. *See* Compl. [1] at

4, 6-8 (describing multiple instances of enforcement). The Government's consistent

enforcement of a policy limiting political expression in common areas is inconsistent with an intent to open those same areas for unlimited veteran expression.

Nor is Plaintiff's comparison between the Resident Guide's disclaimer and the university's policy in *Faulkner*, 410 F.3d 760, persuasive. The forty-six-word disclaimer in the Resident Guide simply informs residents that they are entitled to certain rights; it does not define the contours of those rights. By comparison, in *Faulkner*, the University of Texas at Austin explicitly guaranteed the right of students, faculty, and staff "to express their views, . . . *in all parts of the campus, subject only to rules necessary to preserve the equal rights of others and the other functions of the University.*" 410 F.3d at 767 (emphasis added). The Fifth Circuit found that the University's language qualifying the restrictions to those "necessary to preserve . . . the other functions of the University," were "generally the sort of time, place, and manner regulations that might be enforced in any public forum—designated, traditional, or otherwise." *Id.* at 767-68 (quotation marks and citation omitted). The University's rules "mandate[d] that any substantive restrictions on student speech—at least in open, outdoor portions of campus—must be (1) viewpoint neutral and (2) content neutral," subject to certain exceptions for obscenity, defamation, harassment, and the like. *Id.* at 768. And in creating this policy, the University "affirmatively and expressly guaranteed its students, faculty, and staff virtually all of the rights that the Constitution provides speakers in traditional public spaces." *Id.*

16

But that is not the case here.  Nothing in the Resident Guide or in the Government's conduct demonstrates an intent to open common areas for resident political expression.  Unlike in *Faulkner,* where the University's policies expressly allowed students, staff, and faculty to express their views "in all parts of campus," the Resident Guide expressly prohibits certain kinds of speech in common areas. *Compare Faulkner*, 410 F.3d at 767, *with* Resident Guide at 15.  And the record reflects that the Government has consistently enforced that policy.  In sum, there is no evidence that the Government was motivated by an "affirmative desire" or "express policy" of allowing public expression in campus common areas.  *See Cornelius*, 473 U.S. at 802, 805.  Rather, the Government's policy of restricting certain types of speech and the consistent enforcement of that policy evidences the opposite: an intent to restrict.

Turning to the second element, "the nature of the forum and its compatibility with the speech at issue," *Chiu*, 260 F.3d at 346, Plaintiff contends that the "AFRH is clearly an appropriate forum for veteran expression," because it is a "40-acre property," that houses 494 residents, has many amenities, and is "intended to provide 'a vibrant place in which to live, work and thrive,'" Resp. [20] at 6 (quoting Resident Guide at 3).  Fuselier argues that the Fifth Circuit evaluated a "similar campus" in *Hays*, 969 F.2d 111, and concluded that the nature of the community made it an appropriate forum for expression.  Resp. [20] at 6.

*Hays* evaluated speech restrictions at Southwest Texas State University ("SWT").  *Hays*, 969 F.2d at 114.  The Fifth Circuit explained there that

17

> [r]oughly 5,000 students live and work on the campus, making the
> campus, in the words of the University's own promotional booklet, a
> "town" of which the resident student will be a "contributing citizen" and
> "voting member."  The campus's function as the site of a community of
> full-time residents makes it "a place where people may enjoy the open
> air or the company of friends and neighbors in a relaxed environment,"
> and suggests an intended role more akin to a public street or park than
> a non-public forum.

*Id.* at 117 (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S.

640, 651 (1981)); *see also* Resp. [20] at 6.  SWT's written policies also supported "the

conclusion that the University intended the campus to serve as a public forum for

its students" because they provided, in relevant part:

> Any group or person, whether or not a student or employee, and whether
> or not invited by a registered student, faculty, or staff organization, may
> assemble and engage in free speech activities on the grounds of the
> campus . . . .

*Hays*, 969 F.2d at 117.  And this policy was interpreted to allow any "student or an

organization [to] publicly distribute outdoors, *on grounds owned or controlled by the*

*University*, petitions, handbills," and more, subject to certain content restrictions on

vulgarity and obscenity.  *Id.* (emphasis and alterations in original).  According to

the Fifth Circuit, this evidence "compel[led] the conclusion that the University

deliberately foster[ed] an environment in which students may freely distribute"

literature in outdoor spaces, "subject to the limits necessary to preserve the

academic mission and to maintain order."  *Id.*

But "[t]he mere physical characteristics of the property cannot dictate forum

analysis."  *United States v. Kokinda*, 497 U.S. 720, 727 (1990).  Rather, as the

Supreme Court emphasized in *Kokinda*, it is the forum's physical characteristics

*plus* its function and purpose that is determinative.  *See id.*  And Plaintiff's

18

comparison between the AFRH-G and the university campus in *Hays* focuses entirely on the physical attributes of each forum.  *See, e.g.,* Resp. [20] at 6; Mem. [4] at 5 (discussing only the physical similarities).  But it cannot be, as Plaintiff suggests, that because the AFRH-G shares certain physical characteristics with university campuses, its common areas are transformed into designated public fora for political expression.  If that were the case, then the common areas at Veterans Affairs hospitals, nursing homes, military bases, base housing, military academies, and any other government property that has long-term residents and common spaces would also be transformed into designated public fora.  The Court has been unable to find—and Plaintiff has not cited—a single case that reached that conclusion.  Instead, courts have consistently held the opposite.  *See, e.g., Greer v. Spock*, 424 U.S. 828, 838 (1976) (holding military bases are non-public fora despite some speakers being invited to speak on base); *Shopco Distribution Co. v. Commanding Gen. of Marine Corps Base, Camp Lejeune, N. Carolina*, 885 F.2d 167, 173 (4th Cir. 1989) ("Pizza and laundry deliveries do not convert the base housing areas to a public forum."); *Preminger v. Sec'y of Veterans Affs.*, 517 F.3d 1299, 1313 (Fed. Cir. 2008) ("VA Medical Centers, as exemplified by the Menlo Park Medical Center, constitute nonpublic fora."); *Preminger v. Principi*, 422 F.3d 815, 824 (9th Cir. 2005) (concluding that the nursing home, which housed permanent residents on the Menlo Park Medical Center campus, was a nonpublic forum); *Sussman v. Crawford II*, 548 F.3d 195, 198 (2d Cir. 2008) (per curiam) (holding that the United States Military Academy at West Point is a non-public forum).

Aside from their shared physical attributes, the AFRH-G campus does not share the characteristics of public universities which traditionally foster expressive activity. By their very nature, public universities are compatible with all types of expressive conduct and speech. *See Healy v. James*, 408 U.S. 169, 180 (1972) ("The college classroom with its surrounding environs is peculiarly the 'marketplace of idea[.]'"); *Rosenberger*, 515 U.S. at 835 (noting the importance of rules applying to limited public fora in the university setting, where "the State acts against a background of tradition of thought and experiment that is at the center of our intellectual and philosophical tradition"). Public universities exist to facilitate the exchange of a robust set of ideas and educational opportunities for students, and therefore they "occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (collecting cases). Universities cater to this purpose by allowing students to table on the quad, to solicit student participation in clubs or affinity groups, and to protest.

The AFRH-G does not share these characteristics. Its purpose is to provide "residences and related services" to veterans, not to foster a rich educational environment. 24 U.S.C. § 411(b). These services are primarily mental and physical health services to assist aging veterans. *See* 24 U.S.C. §§ 411(a), 413(b). And the AFRH-G is a gated and guarded federal facility that employs active-duty military personnel.[7] These unique characteristics are not shared by public universities and

---

[7] Notably, the Supreme Court's seminal example of a nonpublic forum, a military base, was more accessible to the public than the AFRH-G campus. *See Greer*, 424 U.S. at 830 (describing how the "main entrances to Fort Dix are not normally guarded, and a sign at one of the entrances says 'Visitors Welcome.' Civilians are freely permitted to visit unrestricted areas of the reservation . . .").

make the AFRH-G incompatible with political speech.[8]  Permitting political expression, such as allowing Fuselier to don apparel with political slogans like "Lets Go Brandon," Compl. [1] at 4, a well-known euphemism for the phrase "F*** Joe Biden," might disrupt the AFRH-G's unique environment which seeks to provide residences for veterans and foster resident physical and mental health, while preserving an environment suitable for active-duty military personnel.  Such political speech disrupts that environment because it is adverse to the AFRH-G's mission and undermines the military's long-standing historical tradition of promoting the appearance of political neutrality among the active-duty personnel working at the Home.  *See, e.g., Parker v. Levy*, 417 U.S. 733, 756-58 (1974); *Greer*, 424 U.S. at 839 ("[M]embers of the Armed Forces stationed at Fort Dix are wholly free as individuals to attend political rallies, out of uniform and off base.  But the military as such is insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates.").

A forty-six-word disclaimer and the presence of residence halls are insufficient to transform the common areas of the AFRH-G into designated public fora.

---

[8] United States military academies are public universities that may share some of these characteristics.  Both military academies and the AFRH-G are gated, guarded, and operated by an executive agency that reports to the Department of Defense.  *See* 24 U.S.C. § 411(d)(3); 10 U.S.C. § 7011.  But when evaluating whether a member of the public could protest at West Point's cantonment, the Second Circuit concluded that West Point was a non-public forum.  *See Crawford II*, 548 F.3d at 198; *Sussman v. Crawford I*, 488 F.3d 136, 140 (2d Cir. 2007).

b.        The AFRH-G's Restrictions Survive First Amendment Scrutiny

Because the AFRH-G's common areas constitute either limited public fora or

nonpublic fora, to pass constitutional muster, its restriction on political apparel

must be "(1) reasonable in light of the purpose served by the forum and (2) [must]

not discriminate against speech on the basis of viewpoint." *Abbott*, 955 F.3d at 427.

The regulation satisfies this test.  First, it is undisputed that the regulation is

viewpoint neutral because it bans all "political" apparel and signage, making "no

distinction based on the speaker's political persuasion." *Mansky*, 585 U.S. at 13.

Second, the restriction is reasonable in light of "the AFRH's purpose to promote a

harmonious environment for its residents, visitors, and employees."  Mem. [19] at 3.

The Government has a legitimate and reasonable interest in promoting

harmony among residents, visitors, and employees at the AFRH-G because of the

unique nature of the forum.  The AFRH-G's purpose is to provide residences and

related services, primarily mental and physical health services, to veterans.  *See* 24

U.S.C. §§ 411(a), 413(b).  It is also a gated, guarded, federal facility that employs

active-duty military personnel and reports to the Department of Defense.  In

*Preminger*, the Federal Circuit evaluated the Menlo Park Medical Center, which

consisted of "buildings and outdoor, communal areas," "a teaching hospital," "three

nursing homes," and "a domiciliary for homeless veterans."  517 F.3d at 1312.  The

court concluded that the campus was a nonpublic forum and that a restriction on

"partisan activities" by "visitors" was reasonable because "[t]he VA must be able to

maintain a place of healing and rehabilitation for the veterans for which it provides

22

services.  Demonstrations and other disruptions could interfere with the VA's ability to provide those services and could impede the VA's ability to carry out its mission of caring for veterans."  *Id.* at 1315.  And in *Principi*, the Ninth Circuit concluded that a restriction on "partisan activities" that prevented the plaintiff from soliciting voters at a VA nursing home was reasonable "in order to prevent the appearance of partisan affiliation."  422 F.3d at 825.  Those same justifications apply equally to the AFRH-G.  Maintaining a place of healing for residents reasonably may require certain limitations on kinds of speech and expression that might interfere with its congressional mandate.  This is especially true in this context because active-duty military personnel work on campus and might inadvertently be pictured or associated with residents engaging in political speech, undermining our Nation's history of a politically neutral military.  In this unique context, the Government has a legitimate interest in promoting harmony on campus.  *See* Mem. [19] at 3.

Plaintiff insists that the policy is "irrational" and lacks "any limiting principle."  Resp. [20] at 7 (quoting *Palo Pinto Cnty. Conservatives*, 2024 WL 3833292, at *2).  He argues—without citation to any authority—that "countless government-owned communal living spaces—including public university dormitories, VA hospitals, and state-owned veteran homes—maintain harmony every day without stripping residents of their First Amendment rights."  *Id.* at 8.  But as the Court has just explained, this is simply not true; those facilities do place restrictions on speech.  Fuselier also asserts that maintaining harmony is an

23

insufficient reason and that "the Supreme Court has unequivocally foreclosed that argument, holding that the wearing of political slogans is 'non-disruptive by nature.'" *Id.* at 6-7 (quoting *Mansky*, 585 U.S. at 19).   But Plaintiff misquotes *Mansky*, inserting the word "by" where it does not appear, and he mischaracterizes its holding.  In *Mansky*, the Supreme Court explained that in some settings, expressive apparel *could* be disruptive:  "[t]o be sure, our decisions have noted the 'nondisruptive' nature of expressive apparel in more mundane settings.  But those observations do not speak to the unique context of a polling place on Election Day." 585 U.S. at 15.[9]

Plaintiff's last argument is that the regulation is unreasonable because it does not define the term "political."  Resp. [20] at 7.  In *Mansky*, the Supreme Court considered the constitutionality of a Minnesota electioneering regulation and held unconstitutional Minnesota's law prohibiting voters from wearing a "political badge, political button, or other political insignia" inside polling places on election day.  585 U.S. at 8.  The Court recognized that Minnesota had a compelling state interest in preventing "fraud, voter intimidation, confusion, and general disorder," and emphasized that "[c]asting a vote is a weighty civic act," entitling voters to "an island of calm" while making their decision.  *Id.* at 14-15.  But the flaw in Minnesota's law was that it drew an "[u]reasonable line."  *Id.*  The "political" apparel ban with its "unmoored use of the term 'political'" and "haphazard

---

[9] In other words, not only does Plaintiff misquote the case, but his characterization of the holding is the opposite of what the Supreme Court concluded. *See Mansky*, 585 U.S. at 15-16.

interpretation in . . . official guidance," lacked an "objective, workable standard[]."
*Id.* at 17.

Since *Mansky*, the Fifth Circuit has provided additional guidance on the circumstances under which the term "political" lacks guidance, at least in the electioneering context. First, in *Ostrewich v. Tatum*, 72 F.4th 94, 97 (5th Cir. 2023), the Fifth Circuit upheld three Texas electioneering statutes relating to political apparel and signage at polling places. The first two statutes prohibited electioneering near polling places, and "electioneering" included the "posting, use, or distribution of political signs or literature." *Id.* at 98 (citing Tex. Elec. Code §§ 61.003, 85.036). But unlike the regulation in *Mansky*, two of the Texas statutes contained language stating that a person may not electioneer "for or against any candidate, measure, or political party." *Id.* at 106 (quoting Tex. Elec. Code § 85.036). The Fifth Circuit concluded that "for or against candidates, measures, and political party," was a sufficient limiting principle. *Id.* at 106-07. The third Texas statute prohibited a person from wearing a "badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of an election," in or around polling places. *Id.* at 98 (quoting Tex. Elec. Code. § 61.010). Again, it was sufficient that the regulation was limited to a "candidate, measure, or political party appearing on the ballot." *Id.* at 105-06.

Next, consider the electioneering laws held unconstitutional in *Palo Pinto County Conservatives*. Unlike the regulations upheld in *Ostrewich*, 72 F.4th 94, the

25

regulations in *Palo Pinto* did "not include any language limiting 'political' signs to only those related to issues 'appearing on the ballot' or 'for or against any candidate, measure, or political party.'" *Palo Pinto Cnty. Conservatives*, 2024 WL 3833292, at *4 (quoting *Ostrewich*, 72 F.4th at 105-06). The lack of definition and limiting principle rendered each of the challenged subsections unreasonable. *See id.* at *4-6.

Here, although the Resident Guide itself does not explicitly state a limiting principle, the Government has provided one through guidance and various announcements in which it interpreted the policy for residents. *See* Compl. [1] at 4, 6, 7; Reply [23] at 5. And because the Government has provided "authoritative constructions in interpreting [the regulation]," the Court may consider them. *Mansky*, 585 U.S. at 17. In June and July 2023, the AFRH-G issued the following weekly bulletins to residents:

> NO POLITICS ZONE: With national and local elections coming up and per guidance from AFRH Legal Counsel & IG and the Resident Guide: "Clothing with racial sexual, political or ethnic slogans is considered inappropriate dress at AFRH-G." Clothing or signs that is [sic] for or is [sic] against any CURRENT candidate is not allowed.

Compl. [1] at 4; Dkt. [1-1].

> POLITICAL CLOTHING/SIGNS: Per guidance from AFRH Legal & IG and the Resident Guide, clothing or signs in support or against a CURRENT political candidate is inappropriate and not allowed at AFRH-G.

Compl. [1] at 4. In February 2024 the AFRH-G issued the following bulletin:

> NO POLITICS ZONE: With national and local elections coming up and per guidance from AFRH Legal Counsel & IG and the Resident Guide: "Clothing with racial sexual, political or ethnic slogans is considered inappropriate dress at AFRH-G." "The First Amendment limits the government's ability to control speech and expression. Residents of

26

> AFRH-G served this country to protect our freedom, and they retain
> their right to engage in vigorous expression and debate."

*Id.* at 6; Dkt. [1-2]. By July and August 2024, the AFRH-G released another:

> NO POLITICS: As per Resident Guide (Pg. 16): "Clothing with racial,
> sexual, political, or ethnic slogans is considered inappropriate dress at
> the AFRH-G". If there are concerns regarding dress within the confines
> of the campus, please notify security or Resident Services to address the
> concerns.

Compl. [1] at 7.

The weekly bulletins issued in June and July 2023 limited the political apparel restriction to "current" political candidates. And in *Mansky*, the Supreme Court endorsed prohibitions on "items displaying the name of a political party, items displaying the name of a candidate, and items demonstrating support of or opposition to a ballot question" as "clear enough." 585 U.S. at 18 (internal quotation marks omitted); *see also Ostrewich*, 72 F.4th at 106-07 (same). Although the language of the AFRH-G's limiting principle varies between 2023 and 2024, Plaintiff's claims relate to this entire period, and "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ostrewich*, 72 F.4th at 105 (alterations in original) (quoting *Mansky*, 585 U.S. at 21).

*Mansky* and its progeny recognize that in some unique contexts, even nondisruptive political expression can be restricted, so long as it is accompanied by some limiting principle. *See Mansky*, 585 U.S. at 15-16. The AFRH-G is one such context and it has articulated a sufficient limiting principle. The AFRH-G is unique in that it houses veterans, provides medical services, and employs active-duty

27

military personnel.  Maintaining a balanced and harmonious environment that accomplishes the AFRH's congressional mandate of providing services for veterans, while also maintaining an environment suitable for active-duty military personnel, reasonably requires certain restrictions.  While the restriction and limiting principle may not be perfect, they do not need to be.  *See id.* at 21.  And historically, federal courts have afforded the Department of Defense and the military greater breadth to construct regulations because of the unique role the military serves.  *See, e.g., Parker*, 417 U.S. at 737-38; *Greer*, 424 U.S. at 839.  Although those considerations may carry somewhat less force here because the AFRH-G is not a military base, the AFRH-G reports to the Department of Defense and employs active-duty military members.

In this unique context, the Government's restriction on political apparel reasonably advances its legitimate interests in promoting the harmonious environment needed to accomplish the Home's congressional mandate and to safeguard good order and discipline for the troops employed at the AFRH-G.

C.    Plaintiff's Facial Challenges to the AFRH-G Restrictions

Plaintiff mounts two facial challenges to the AFRH-G's political apparel ban, specifically that the AFRH-G's political apparel regulation is "facially vague" and "substantially overbroad."  Compl. [1] at 10-11.  Although he does not specify whether he is raising both an as-applied challenge and a facial challenge, Fuselier seeks to certify and represent a class of veteran residents at the AFRH-G, *id.* at 9, and requests a declaration that the policy violates the First Amendment and a

28

"preliminary and permanent injunction" enjoining the enforcement of the "political slogan ban," *id.* at 13. This relief would require invalidating the regulation altogether, relief that follows from a successful facial challenge. *See LIA Network v. City of Kerrville,* 163 F.4th 147, 162 (5th Cir. 2025).

For facial challenges in the First Amendment context, "[t]he question is whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (internal quotation marks omitted). "This inquiry begins with an assessment of the law's scope: 'what activities, by what actors,' does the law 'prohibit or otherwise regulate?'" *Woodlands Pride v. Paxton*, 168 F.4th 293, 307 (5th Cir. 2026) (quoting *Moody*, 603 U.S. at 724). Next, the Court determines "which of the law's applications violate the First Amendment. And finally, we take the unconstitutional applications and 'measure them against the rest.'" *Id.* at 307-08 (quoting *Moody*, 603 U.S. at 724).

Here, as previously discussed, it is undisputed that the regulation prohibits residents of the AFRH-G from displaying signage or wearing apparel with "political" slogans only while they are in campus common areas. The Court has determined that the law's application to Plaintiff and other veterans did not violate the First Amendment because the regulation is reasonable in light of the fora's purpose. *See supra* II.B.2. In coming to that conclusion, the Court determined that the AFRH-G's common areas were limited public fora and that the Government's restrictions

29

were reasonable because the term "political" was accompanied by clarifying language.  *See id.*

With the regulation's scope properly defined, the next step in the facial analysis requires the Court to determine which of the regulation's applications violate the First Amendment and compare them to those that do not.  *See Woodlands Pride*, 168 F.4th at 307; *LIA Network*, 163 F.4th at 162-63.  Neither party briefed this standard nor conducted a facial analysis.  The regulation's plainly legitimate sweep is broad; the Government may regulate speech on property it owns, and these regulations may limit certain subject matter so long as the restriction is reasonable in light of the forum's purpose.  *See, e.g., Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 538 (1980) ("Nevertheless, governmental regulation based on subject matter has been approved in narrow circumstances . . . this Court has recognized that the government may bar from its facilities certain speech that would disrupt the legitimate governmental purpose for which the property has been dedicated.").  Even assuming, as Plaintiff claims, that the regulation unconstitutionally chills or restricts some protected speech, *see* Compl. [1] at 11, "the ratio of unlawful-to-lawful application is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth," *United States v. Hansen*, 599 U.S. 762, 784 (2023) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).  Plaintiff's first facial challenge cannot succeed.

30

Next, Fuselier contends that the political apparel regulation is "facially vague." Compl. [1] at 10. "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (citation and internal quotation marks omitted). Although "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," there must be some "objective, workable standard[]." *Mansky*, 585 U.S. at 21 (citation omitted).

According to Plaintiff, the AFRH-G's political apparel restriction is "facially vague" because "it fails to provide residents sufficient information to know what is restricted or what is required of them," and "it fails to provide sufficient precision and guidance so that those enforcing the policy do not act in an arbitrary or discriminatory way." Compl. [1] at 10. Again, neither party briefed the vagueness challenge at the summary judgment stage.

While the term "political" can be vague, where, as here, the Government provides a workable standard to clarify what the term "political" means, the restriction is not unconstitutionally vague. *Compare Mansky*, 585 U.S. at 11 (endorsing prohibitions on "items displaying the name of a political party" and "items displaying the name of a candidate" as "clear enough"), *and Ostrewich*, 72 F.4th at 106-07 (same), *with People for Ethical Treatment of Animals v. Hinckley*, 526 F. Supp. 3d 218, 238 (S.D. Tex. 2021) (denying motion to dismiss vagueness

31

claim because it was plausible that Texas A&M's restriction of advertisements for "political campaigns and viewpoints or endorsements" was vague because "there [was] no indication there are standards provided to clarify what the restriction means"). For the same reasons the Court discussed previously, *see supra* II.B.2, the "political apparel ban" is not unconstitutionally vague because the Government has provided an interpretation clarifying its scope.

### III.  CONCLUSION

Plaintiff remains free to exercise—and indeed should exercise—his First Amendment rights in parks, on sidewalks, and in other public spaces. Our Republic is healthiest when the public is exposed not only to ideas they ascribe to, but also, and especially, to those they do not. *See* JOHN STUART MILL, ON LIBERTY 33 (London, J.W. Parker 1859). But in this case, summary judgment on Plaintiff's claim is appropriate. To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff Johnny Fuselier's Motion [3] for a Preliminary Injunction is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Motion [18] of Defendant John S. RisCassi, in his Official Capacity as Chief Operating Officer of the Armed Forces Retirement Home, for Summary Judgment is **GRANTED**, and Plaintiff Johnny Fuselier's claims will be **DISMISSED WITH PREJUDICE**. The

Court will enter a separate Final Judgment in accordance with Federal Rule of Civil

Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 1st day of May, 2026.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE